**Judith Alverta Ruth SMITH, et al., Plaintiffs,**

v.

**CITY OF ELYRIA, et al., Defendants.**

**No. 1:91CV0372.**

United States District Court, N.D. Ohio, Eastern Division.

July 28, 1994.

Robert D. Gray, Lorain, OH, Gordon S. Friedman, Friedman & Gilbert, Cleveland, OH, for plaintiffs.

Stephen J. Gurchik, City of Elyria, Office of the Asst. Sol., Department of Law, Elyria, OH, Smith R. Brittingham, IV, Alan E. Johnson, Leo R. Ward, John J. Ricotta, Mark P. Herron, Ward & Associates, Cleveland, OH, for defendants.

## MEMORANDUM OF OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART

WELLS, District Judge.

This case is before this Court on the motion for summary judgment filed by the defendants, the City of Elyria, Ohio, and police officers Arthur Charles, Frederick Altheide, and Michael Adkins. The Court referred this matter to United States Magistrate Judge Patricia A. Hemann for a report and recommended decision.

Magistrate Judge Hemann has submitted her report and recommendation, recommending that the Court grant judgment for all defendants on plaintiffs' procedural due process claim, plaintiffs' equal protection claims based on race and sex discrimination, and plaintiffs' state law claims. The Magistrate Judge further recommended that the Court grant judgment for the individual defendants on the remainder of plaintiffs' constitutional claims because of qualified immunity. She recommended that the Court deny the defendant City's motion for summary judgment with respect to plaintiffs' substantive due process claim and equal protection claim based on discriminatory treatment of domestic abuse victims. Both parties have objected to the Magistrate Judge's report.

For the following reasons, the Court will grant judgment for all defendants on plaintiffs' procedural due process claim and equal protection claim based on race discrimination. The Court will further grant judgment for the individual defendants on plaintiff's other constitutional claims based on qualified immunity. The Court denies defendants' summary judgment motion with respect to plaintiffs' substantive due process claim,

their claims for violation of the equal protection clause based on discriminatory treatment of women and domestic abuse victims, and their state law claims.

## GENERAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure permits this Court to enter summary judgment for the defendants only if there are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law. In determining whether there are any genuine issues of fact for trial, this Court must examine the evidence in the light most favorable to the plaintiff.

## STATEMENT OF FACTS

### 1. The Events of March 6, 1989.

The following material facts are undisputed. On March 6, 1989, Karen Guerrant ("Karen") was stabbed 12 times and killed by her ex-husband, Alfred Guerrant ("Alfred"). Alfred also stabbed and injured his 9 year old daughter, Elaine Guerrant ("Elaine"), and Karen's sister, Dorice Smith ("Dorice").

Karen and Alfred were married twice, from November 1978 to July 1981, and from February 1986 to January 1987. They had two children, Elaine and Whitney. At the time of their second divorce in 1987, they lived in Oberlin, Ohio. Karen moved to Elyria, Ohio, in June 1988.

In May 1986, Karen filed a complaint with the Oberlin police alleging that Alfred threw and broke household items, grabbed her around the throat, threatened her with a flower vase, threatened to break a glass plate over her head, and threatened to shove a piece of glass through her heart. He was charged with "knowingly caus[ing] or attempt[ing] to cause physical harm to a family or household member," a first degree misdemeanor, and was sentenced by the Oberlin Municipal Court to six months in the Lorain County Jail and a $500 fine. He was given credit for time served, and the balance of the sentence was suspended "subject to 2 years Good Behavior and further condition that Defendant shall not contact or otherwise in-

terfere with Complainants peaceful existence."

Alfred was indicted in October 1986 for forging Karen's checks. He plead guilty to four counts of uttering and was sentenced by the Lorain County Court of Common Pleas to one and one half years in the Chillicothe Correctional Facility on each count. This sentence was also suspended and Alfred was placed on probation for three years. In March 1988, he admitted he violated the terms of his probation, and was ordered to serve his sentence of imprisonment. He was released on parole in November 1988.

On March 2, 1989, Karen permitted Alfred to move into the guest room of her house in Elyria. There is no evidence that he paid rent, signed a lease, or otherwise established a property interest in the house.

On the morning of March 6, 1989, Karen and Alfred argued because Karen had given Alfred the only key to the house and he would not return it so she could make a duplicate. Karen went to work and the children went to school, but the adults resumed the argument when Karen returned at approximately 6:00 p.m. Karen told Alfred to leave the house; Alfred refused.

At 6:21.50 p.m., Karen called the Elyria Police Department. The call was answered by police dispatcher Kimmet. During their 34 second conversation, Karen told Kimmet her ex-husband was at the house and would not leave. She gave Kimmet the date of the divorce. Kimmet said he would send someone.

Approximately 2 minutes later, at 6:23.58, Kimmet contacted defendant Officers Frederick Altheide and Arthur Charles by radio and dispatched them to the Guerrant residence. Altheide asked Kimmet how long the Guerrants had been divorced, "or is it just a separation or what?" Kimmet said they had been divorced since 1986.

Altheide and Charles arrived at the Guerrant residence at 6:30 p.m. According to Charles' testimony at Alfred Guerrant's murder trial, they saw Alfred in the front door of the house with a garbage bag, "and there was another person who I did not see inside the house and we could see and hear some argument going on." They entered the house with Alfred. Karen was inside with the children, very upset. She told the officers that she wanted Alfred to leave the house. In his trial testimony, Altheide said he asked Karen whether Alfred had been violent or threatened violence, and she said no. She told them she wanted him to leave because he was upsetting her child. She also said he was on probation, and she had allowed him to stay there because he said he had no other place to go. The officers did not talk to Alfred and Karen separately.

Officer Charles testified that he and Altheide told Karen:

> [T]here was not a whole lot that we could do. She initially invited him into the house and he had been there for a week, and he had shown no violence towards anyone, and had not damaged any property and his only wish was to stay for one more day until he could locate a place to stay.

Charles also stated that "We weren't going to put him out in the weather with what he had and the clothes in the garbage bag. We weren't going to do that." The police officers told Karen that it was a civil matter, not a police matter, and she should initiate eviction procedures if she wanted Alfred to move out. They told her to call back if she felt the situation was getting out of hand.

Charles and Altheide told Alfred that Karen could not "just put him out at her whim," because she had invited him. They also told Alfred that Karen could not just throw his clothes out the door. As the police officers were leaving, Karen threw a plastic bag containing Alfred's clothing out of the window. Alfred asked the police officers what he could do about that, and the police officers said, "Well, just throw them back in." They then pulled away. Officers Altheide and Charles were at the house for approximately 3 minutes.

Immediately after the police left, Karen told the nine-year old, Elaine, to call Karen's sister, Dorice, and ask her to come. Karen took the telephone and spoke directly with Dorice, asking her to help remove Alfred from the house. Dorice arrived less than five minutes later. During that time, Elaine

testified that Alfred pushed Karen and she fell; Karen pushed him back, and told the child to call police.

At 6:47 p.m., Elaine called the Elyria police department. The call was handled by dispatcher Molly Mitchell (now Henderson). Elaine told Henderson that "my daddy's beating up my mom.... I want the police.... mommy told me to." Dorice then took the telephone and explained there was someone in the home who had no property interest in it and whom the owner had ordered to leave. Henderson responded, "She let him move in there.... Ma'am if she lets him live there ... this is a civil matter."

Henderson asked, "Is he beating her now?" Dorice said, "He has." Henderson repeated the question, and was told "No." Background noise on the police tape of the conversation indicates that Henderson could hear an argument in the background.

Henderson put Dorice on hold and turned the call over to her supervisor, defendant Michael Adkins. Dorice told Adkins that, "He needs to go." Adkins replied:

> Well we can't, we can't just throw him out, ma'am. She didn't call us when she let him move in there. This is not a police matter unless there is a [sic] violence occurring right now. We were just over there and there was no violence.

Adkins further told her, "That's not my problem, that's a civil matter," and suggested that she get an attorney. When Dorice continued to argue with him, Adkins hung up on her. The time was 6:51 p.m.

Dorice then went into the living room and started yelling at Alfred. Although Alfred threatened both Karen and Dorice, there was no physical contact.

At 6:54 p.m., Dorice called the Lorain County Sheriff's Office. The Sheriff's Office could plainly hear fighting in the background. The Sheriff's Office told Dorice they would "get somebody out there."

At 6:55 p.m., the Sheriff's Office called the Elyria Police Department and reported a "domestic." Henderson responded, "These people are pissing .... making me mad!" The Sheriff's Office informed her that there was yelling and screaming. When Henderson tried to explain that they had just been at the house, the Sheriff's Office reported, "Well, they just called me and they're beating the shit [out] of each other, so whatever you guys, you want to do."

Three and one-half minutes after this call, at 6:58.44 p.m., Henderson began to contact police officers by radio. Altheide answered the first call but he was at "lunch"; Henderson testified that she would not call an officer off lunch for a "basic disturbance."

At 7:00 p.m., another dispatcher reported a call from Karen's neighbor, who stated that there was a woman in her house reporting a stabbing. At 7:02, the nine-year old child, Elaine, called and told Henderson her father had stabbed her mother, and her father had left the house. At 7:03, Elaine called again and reported her mother was dead. She also said her father had cut her ear. Her two year old sister, Whitney, had not been hurt, but was "so scared." Henderson asked Elaine to hold Whitney and kept her on the telephone until the police officers arrived. At 7:08, police officers Miller and Folley arrived at the house. They found that Karen was dead, and part of Elaine's ear had been cut off.

Dorice testified about the events during the seventeen minute interval between the time of her last call to the Elyria police and their arrival. She said that she joined the argument between Alfred and Karen, and Karen directed her to throw Alfred's clothing out the window. She saw a flash of light, saw Karen stumbling into the bedroom, and realized Alfred had a knife. Karen fell on top of Dorice, and both fell into a corner. Alfred was stabbing Karen. Dorice put her arms around Karen and grabbed at the knife blade, trying to take it away from Alfred. Both Karen and Dorice called for help.

The child, Elaine, came into the room with a knife and tried to stab her father. As he swung around to face her, the knife cut his forehead. He then chased her down the hall. She tripped over a basket of clothes. Alfred cut her ear, then returned to the bedroom and continued to stab Karen. Meanwhile, Dorice had escaped and run to a neighbor's house. She had tried to get the two-year old

child, Whitney, as she left, but Whitney was hiding under a table. Alfred ran from the house, and the nine-year old child called the police.

Alfred later waved down a police car and surrendered. On July 21, 1989, he was found guilty of the aggravated murder of Karen and felonious assault of his daughter, Elaine. He was found not guilty of attempted murder of Karen's sister, Dorice.

After this incident, Captain Cameron of the Elyria police department reviewed the tape recordings and concluded that there was "no problem with what had transpired. We handled this Domestic [sic] dispute as we would any other." Police Chief Rodger Griffith reviewed his report and determined that no action should be taken against any of the officers involved.

### 2. *Police Policies Regarding Domestic Disputes.*

The Elyria Police Department had two written policies regarding the handling of domestic violence, a 1984 policy entitled "Field Operation Family Disputes," ("FOFD") and a 1986 document entitled "General Order 86–2." While plaintiffs maintain the FOFD was the policy the defendants followed, defendants argue that General Order 86–2 was the effective policy at the time.

The FOFD provides, in pertinent part:

4. *Arrest.* There are some situations when there is no reasonable alternative but to arrest, for instance where there has been a serious assault committed in the officer's presence. But as a general guideline avoid, if possible, resorting to arrest as the solution to a family dispute. Too often the bitterness which is created by the arrest either makes the situation between the disputants worse or creates a serious danger for the arresting officer [due] to possible efforts to resist arrest. This last point is especially true when a husband or father is arrested in his home; he is upset in the first place and if he is then taken into custody from his home in front of his family, desperate resistance can result. It is not uncommon for one of the parties in the heat of the dispute, where any kind of assault has occurred, to demand the oth-

er's arrest. But it is also not uncommon the next day following arrest for the same person who demanded arrest to refuse to cooperate in the prosecution and even criticize the police for having made the arrest in the first place. Being aware of this, when no serious crime has been committed and yet one of the parties demands arrest, try to discuss with that party the ramifications of such action, i.e., filing a complaint, attempting to convince the complainant to be calm and logical. Point out the existence of other ways to solve the dispute and that the other person (usually the husband) would lose income from not working and that a detrimental effect on the children is likely. But, as previously stated, in some cases arrest is the only alternative. Where it is, the normal arrest procedure should be followed. Remember to inform the complainant of his or her responsibilities to institute and sign the complaint and to testify in court.

General Order 86–2 states that "[c]omplaints involving domestic violence or the threat of domestic violence will be given a high priority response." Officers responding to the complaint are to attempt to stabilize the situation, "[s]eparate the individuals involved and carefully listen to each person" and gather sufficient information to effectively evaluate the situation. If no criminal offense is involved, the officer is directed to mediate, make a referral or separate the parties. If there is actual or threatened violence, the officer is instructed to tell the victim of his or her right to file a complaint, and to provide an information sheet describing the procedure for doing so. Captain Cameron of the Elyria Police Department stated that the officers involved in this case complied with General Order 86–2.

### 3. *Other Evidence.*

Plaintiffs present several reports, affidavits and deposition testimony in support of their equal protection claims. First, plaintiffs present the report of Dr. James J. Fyfe, Ph.D., a professor at the School of Public Affairs at The American University, who concluded that the police department "follows a custom and practice of denying equal protec-

tion to victims of domestic violence," and in this case "actually increased the hazards [Alfred] presented to his ex-wife, daughter, and ex-sister-in-law."

In addition, Calvin Hernton, a professor of Black Studies and Creative Writing at Oberlin College, stated that, based on his expertise in dialect, idioms, syntax, and ethnic drawls, it was not immediately apparent that Karen's voice was that of a black person, but Dorice's voice was obviously that of a black person. He opines that Henderson's reference to "those people" could only be interpreted as an anti-black remark.

Tanza Ross is a black woman resident of Elyria who has been a victim of domestic violence. She reported that the Elyria police were unresponsive to her reports of domestic violence, and opines that the reason was that she was a black woman. Rosemary Creedon, director of Genesis House, a shelter for domestic violence victims, testified that in her experience the police were slower to respond to domestic violence calls than to non-domestic calls, and were slower to respond in black communities than in white communities.

Barbara Ramage, an attorney at the Lorain County Legal Aid Society, described her experience with reporting the mishandling of domestic disputes by the Elyria police, and providing training workshops on domestic violence. Herman Larkins, Sr., chairperson of the Legal Redress and Complaint Committee of the NAACP Elyria Branch, reported that the NAACP had previously expressed concern to the police department about abusive language and racial slurs, use of excessive force, and slow response time to calls from black persons. He did not specifically refer to domestic violence cases.

### LAW AND ANALYSIS

Count one of the complaint presents five claims for constitutional violations under 42 U.S.C. § 1983, specifically, violation of plaintiffs' substantive and procedural due process rights, and violation of plaintiffs' equal protection rights based on their race, sex, and status as victims of domestic violence. Count two claims that defendants are liable to plaintiffs under state law because their injuries were caused by defendants' negligence, recklessness and/or maliciousness, including dereliction of duty and failure to report child abuse. Finally, Count three claims that defendants are liable for the wrongful death of Karen Guerrant. Each of these will be addressed in turn.

#### A. 42 U.S.C. § 1983.

To recover under 42 U.S.C. § 1983, a plaintiff must demonstrate that he or she was deprived of a constitutional right by a state actor. A municipality may be liable for a constitutional violation under § 1983, but only if the violation was caused by a municipal policy or custom, that is, if the municipality itself caused the constitutional violation. *Respondeat superior* or vicarious liability does not apply under § 1983. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

For purposes of this motion, the Court will assume that the police officers were "state actors." The issues are whether there is evidence that a constitutional violation occurred, and if so, whether there is evidence that a municipal policy or custom caused the violation.

#### 1. Substantive Due Process Claim.

Plaintiffs claim that the Due Process Clause imposed a duty on the police to protect Karen Guerrant's life and liberty. As a general matter, the purpose of the Due Process Clause "was to protect the people from the State, not to ensure that the State protected them from each other." *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). Therefore, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004.

The State may assume an affirmative duty to prevent harm when the State takes custody of a person and deprives them of their liberty so that they cannot protect themselves, or when the State affirmatively places the person in a position of danger. *Collins v. Harker Heights,* 503 U.S. ——, ——, 112 S.Ct. 1061, 1062–63, 117 L.Ed.2d

261, 274 (1992); *DeShaney*, 489 U.S. at 201, 109 S.Ct. at 1006. The mere fact that the State is aware that a person is in danger does not create a duty to protect, even if the State expresses willingness to protect the victim. *DeShaney*, at 197–98 n. 4, 109 S.Ct. at 1004–05 n. 4. The State must take some action which places the victim in a dangerous position, or increases the potential danger, or deprives the victim of his or her ability to use self-help.

■ Plaintiffs in this case have presented evidence that the police officers either created or increased the danger to Karen Guerrant when (1) Officers Altheide and Charles told Karen, in Alfred's presence, that she would have to initiate eviction proceedings to remove him from the house, (2) they told Karen to call back "if she felt the situation was going to get out of hand," and (3) they told Alfred he should throw his clothing back in the house if Karen threw it out. Henderson and Lieutenant Adkins rejected the child Elaine's and Dorice's later pleas for police assistance. This evidence presents a genuine issue of material fact about whether the police affirmatively increased the danger to Karen while limiting her ability to help herself and made her more vulnerable to attack, then refused to help her. Cf. *Dwares v. New York*, 985 F.2d 94, 99 (2d Cir.1993); *Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir.1990); *Pinder v. Commissioners*, 821 F.Supp. 376 (D.Md.1993).

Unlike the situation in *Nobles v. Brown*, 985 F.2d 235 (6th Cir.1992), the facts here support a claim that the police officers' *affirmative acts* created or increased the danger to Karen Guerrant. The police officers did not merely fail to perform their duties; they told Alfred Guerrant that he did not have to leave, and advised him to go back if Karen tried to throw him out. Thus, this case is more akin to the facts in *Nishiyama v. Dickson County, Tennessee*, 814 F.2d 277 (6th Cir.1987), in which the police authorized an inmate to use a marked patrol car, and the inmate used the apparent authority of the police to stop an automobile and murder the occupants. Here, Alfred used the apparent authority given to him by the police to re-

main in his ex-wife's home against her will, and later killed her. *Also see Dwares, supra.*

■ Defendants argue they had no grounds for removing Alfred from Karen's home; to do so, they claim, would have subjected them to a Fourth Amendment claim. Specifically, defendants argue they could not arrest Alfred under the criminal trespass statute because he had a privilege to remain on the property arising out of an emergency or necessity, because of the cold temperatures that day. Although Alfred told them there was no place else where he could go, there is no evidence the police officers inquired about alternative ways to deal with this "emergency." Furthermore, the defendants' only legal basis for this argument is the Committee Comment to Ohio Rev.Code Ann. § 2911.21, which describes the privilege of a vessel in distress to tie up at a private dock as an example of an emergency which creates a privilege justifying unauthorized intrusion on private property. There is no authority for the proposition that a police officer cannot remove an unwanted person from a private home in inclement weather, and the Court rejects this assertion.

Defendants also argue they could not arrest Alfred for trespass because his "legal status with regard to the house was unclear to the officers and to the dispatcher." This assertion is inconsistent with the police officers' affirmative statement to Karen Guerrant that she would have to initiate eviction proceedings to remove Alfred. Furthermore, there is no evidence that the police officers questioned Alfred or Karen Guerrant to determine Alfred's status. They now contend he was a tenant-at-will and could not be removed without eviction proceedings, but at the time, their focus was exclusively on the weather and the fact that Karen Guerrant had invited him to stay. Lieutenant Finch testified that if an unwanted stranger refused to leave a home, the stranger would be arrested "in almost a hundred percent of the time. . . ." Cf. *State v. Steffen*, 31 Ohio St.3d 111, 115, 31 OBR 273, 509 N.E.2d 383 (1987) (invitee is no longer privileged to remain in a private home once he knows his privilege is terminated). In short, there are genuine issues of material fact as to whether the

police officers actually believed they lacked probable cause to arrest Alfred Guerrant for criminal trespass.

The Court finds that genuine issues of material fact preclude summary judgment on plaintiffs' substantive due process claim.

### 2. *Procedural Due Process Claim.*

■ In their procedural due process claim, plaintiffs apparently assert that Ohio Rev. Code Ann. §§ 2921.44(A)(2) (Dereliction of Duty) and 2921.45(A) (Interfering with Civil Rights) create a constitutionally protected property interest. Plaintiffs also claim defendants were obligated to protect them because of a "special relationship" between them. Plaintiffs contend defendants deprived them of these property interests by failing to arrest Alfred Guerrant and prevent the attack.

The existence of a statutory duty on one party does not necessarily create a corresponding constitutionally protected property interest in favor of all persons who might benefit from the performance of the duty. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The Ohio criminal statutes against dereliction of duty and interference with civil rights do not give plaintiffs any *property* right in the non-violation of those statutes.

Ohio appellate courts have held that the special relationship doctrine has been abrogated by the adoption of the sovereign immunity statute, Ohio Rev.Code Ann. 2744.02. Therefore, the special relationship doctrine does not provide plaintiff with a protected property interest under Ohio law.

Absent a protected property interest, plaintiffs cannot claim defendants failed to accord them procedural due process. The Court therefore finds defendants are entitled to judgment as a matter of law on plaintiffs' procedural due process claim.

### 3. *Equal Protection Claims.*

Plaintiffs claim defendants did not treat them equally because of their status as (a) blacks, (b) women, and (c) domestic violence victims. The standard applied to each of these claims is different, and will be discussed separately below.

#### a. *Race Discrimination.*

■ Plaintiffs claim defendants treated them differently because of their race. If plaintiffs succeed in demonstrating different treatment, defendants are required to show that the different treatment was necessary to serve a compelling government interest.

The Court agrees with Magistrate Judge Hemann that plaintiffs have failed to present evidence from which a reasonable jury could find that defendants treated them differently because of their race. The only direct evidence of racial discrimination is Henderson's statement that "those people" "are making me mad." This statement does not have a necessarily racial connotation. Mr. Larkins' affidavit about the NAACP's complaints to police, and Ms. Ross' affidavit about her own treatment, do not demonstrate that police treated Karen Guerrant differently because of her race, or even that the police generally treated blacks' requests for police assistance differently than whites'. Finally, Ms. Creedon's testimony that police respond more slowly to complaints by black women "in the projects area" is not probative here because there is no evidence that Karen Guerrant lived in this area. The Court therefore finds the defendants are entitled to judgment as a matter of law on this claim.

#### b. *Sex Discrimination.*

Plaintiffs' equal protection claim that they were treated differently because of their sex is based on the police department's policy for handling domestic violence cases. To succeed on this claim, plaintiffs must demonstrate that the policy applied was either discriminatory on its face, or had a disproportionately adverse impact on women and was motivated by discriminatory intent. *Personnel Admr. v. Feeney*, 442 U.S. 256, 274, 99 S.Ct. 2282, 2293–94, 60 L.Ed.2d 870 (1979). If they succeed in doing so, defendants must show that the policy is substantially related

**1212**

to an important governmental interest. *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1977).

Defendants argue that General Order 86–2 was the policy actually in effect and applied by the police officers here. However, the Court agrees with Magistrate Judge Hemann that there is a factual question about what policy was actually being applied. Although it is unclear whether the officers were following the 1984 FOFD, it is apparent they were *not* following General Order 86–2. They did not separate the individuals involved, or mediate, make a referral or separate the parties, or instruct Karen Guerrant about her right to file a complaint, or provide her with an information sheet describing the procedures for doing so. Nor did they give a high priority response to Dorice Smith's later calls for assistance; despite the argument they could hear in the background, they hung up on her. The City has confirmed the police officers involved complied with the City's policy. There is a genuine issue of fact as to the policy the officers were actually following, the FOFD or an unwritten policy.

Plaintiffs have admitted the FOFD was not discriminatory on its face; no evidence has been presented that any unwritten policy was overtly or covertly based on gender. Therefore, the Court must determine whether there is evidence the policy had a disproportionately adverse impact on women, and if so, whether the adverse effect was motivated by an intent to discriminate against women. *Feeney,* 442 U.S. at 274, 99 S.Ct. at 2293–94.

■ The record contains considerable evidence that the police department treated domestic disputes differently than non-domestic disputes, and this had a disproportionately adverse impact on women because women are victims of domestic violence more frequently than men. Furthermore, the FOFD provides some evidence that this different treatment was intended to "accomplish the collateral goal of keeping women in a stereotypic and predefined place." *Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296. The FOFD assumes (1) the potentially violent party in a family dispute will be a man, (2) the dispute will be occurring in "his home," (3) the woman complainant will be upset and·irrational

and will probably later refuse to cooperate in the prosecution, and (4) the man will be the wage earner in the family and it would be detrimental for the family to lose his income. The policy against arrest requires the police officer to persuade the woman victim to live with violence or the threat of violence to protect the integrity of the family, a result she is expected to want more than her own physical safety.

The manner in which the police officers actually responded to this incident also provides evidence from which a jury could find intent to discriminate against Karen Guerrant on the basis of her sex. Although they knew that Karen and Alfred Guerrant were divorced, the police officers continued to assume that Alfred had a right to stay in the house against Karen's will, and even advised him to go back if she tried to remove him by throwing his clothing outdoors. These facts demonstrate discriminatory intent because they reveal a sexually discriminatory assumption that Alfred Guerrant had a right to exercise dominion and control over his ex-wife and her home.

There is evidence in the record from which a jury could find the defendants' domestic disputes policy had a discriminatory impact and was motivated by intent to discriminate against women. Defendants have presented no evidence that this policy is substantially related to an important government interest. Therefore, genuine issues of material fact preclude summary judgment on this claim.

c. *Discrimination Against Victims of Domestic Violence.*

■ The evidence which supports plaintiffs' claims of sexual discrimination also supports plaintiffs' claim that defendants discriminated against them because of their status as victims of domestic violence. As noted above, there is evidence in the record that the Elyria police department treated domestic disputes differently than non-domestic disputes. The FOFD expressly treats these situations differently. In addition, in this case, (1) the police officers refused to remove Karen Guerrant's former spouse, Alfred, from her house although Lieutenant Finch said that a stranger would have been re-

moved; (2) when Karen put Alfred's clothes outdoors, the police officers advised Alfred to put his belongings back in Karen's house; (3) the officers, with no basis in law or fact, gave Alfred authorization to stay in his ex-wife's house against her will by telling him that Karen was required to take civil action to evict him; (4) the police officers insisted that this was a "civil matter," and refused to respond unless he was "beating her now," and (5) Lieutenant Adkins' told Dorice that, "She didn't call us when she let him move in there." These facts demonstrate discrimination against victims of domestic violence because they show that the police officers believed Karen was "asking for it" by allowing Alfred to stay. This evidence also demonstrates that, due to the domestic nature of the dispute, the police failed to separate the parties.

Because status as a victim of domestic violence is not an invidiously discriminatory classification, the City need only show that differing treatment of domestic and non-domestic disputes is rationally related to a legitimate governmental purpose. Defendants have not articulated any reason for treating the two situations differently. *Cellini v. Sterling Heights,* 856 F.Supp. 1215 (E.D.Mich.1994). Therefore, their motion for summary judgment on this claim is denied.

### 4. *Municipal Policy or Custom.*

■ As noted above, the City is liable for the actions of its police officers only if the alleged constitutional violations were caused by an official policy or custom. *Monell, supra.* Here, the Elyria police department determined that the officers involved acted in a manner consistent with its existing policy. There is evidence that the police officers involved treated Karen Guerrant differently because of her sex and because of her status as a victim of domestic violence. There is also evidence that the police officers affirmatively created or increased the danger to Karen Guerrant and limited her ability to use self-help, then failed to protect her. If plaintiffs prove these constitutional violations, the City has admitted that the violations were caused by City policies.

In addition to their claim that City policy caused the police officers' unconstitutional conduct, plaintiffs also contend the City of Elyria failed to train its police officers about the appropriate handling of a domestic dispute and failed to supervise its police officers, allowing them to apply the law in an unequal manner. Plaintiffs claim the inadequate training and supervision reflected deliberate indifference to the rights of city residents, that is, a deliberate or conscious choice by the City to allow constitutional violations to occur. The issues are, therefore, (1) was the training given to the Elyria police officers adequate, and if not, (2) can the inadequate training justifiably be said to represent city policy. *See Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 1205–06, 103 L.Ed.2d 412 (1989).

Plaintiffs do not identify any particular deficiencies in the training given to the officers. Instead, plaintiffs claim that inadequate training is shown by the officers' behavior and the fact that they could not remember the content of the training program. Dr. Fyfe reviewed the officers' conduct and determined that they had been inadequately trained.

The police officers' conduct, in itself, does not demonstrate that they were inadequately *trained.* It is equally possible that the officers here were given proper training, but failed to apply it. *Cf. Canton,* 489 U.S. at 391, 109 S.Ct. at 1206. Dr. Fyfe's opinion that the officers were inadequately trained does not provide any further support here, because his opinion was only based on the officers' handling of this incident. Therefore, plaintiffs have failed to present any evidence that the Elyria police officers were inadequately trained.

Although there is no evidence in the record that the police officers were inadequately trained, there is evidence that the violation of plaintiffs' constitutional rights was caused by a City policy or custom. This evidence precludes summary judgment for the City.

### 5. *Qualified Immunity.*

■ Individual defendants Charles, Altheide, and Adkins have moved for sum-

1214

mary judgment on the ground that they are qualifiedly immune from liability under § 1983. An individual defendant is qualifiedly immune from personal liability for damages under § 1983 if a reasonable police officer could have believed that his or her actions were lawful, in light of clearly established law and the information the officer possessed. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987). In order to be held personally liable, the unlawfulness of the officer's actions must be apparent in light of preexisting law. Therefore, the contours of the right the officer allegedly violated "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.,* at 640, 107 S.Ct. at 3039.

 Plaintiffs have adduced evidence that the defendants violated their substantive due process rights and their right to equal protection on the basis of their sex and their status as victims of domestic violence. However, the Court finds that these rights were not "clearly established" at the time of the officers' actions here. Plaintiffs' substantive due process claim is based on language the Supreme Court's decision in *DeShaney. DeShaney* had not even been decided when Karen Guerrant was killed. Furthermore, the *DeShaney* decision itself did not *clearly* establish that the police have a duty to protect when they create or enhance the danger to a potential victim of private violence. While the Court suggested that a duty to protect would arise if the police created or enhanced a risk of violence, those facts were not before the Court in that case and therefore were not expressly decided.

There is, as yet, no definitive Sixth Circuit or Supreme Court decision determining that police policies for handling domestic disputes may violate the victims' right to equal protection on the basis of their sex or status as victims of domestic violence. Therefore, it was not clearly established that the equal protection rights of women and victims of domestic violence may be violated when the police accord different treatment to their calls for assistance in a domestic dispute.

Because plaintiffs' substantive due process and equal protection rights were not clearly established under these circumstances, the Court finds that the individual police officers are qualifiedly immune from individual liability under § 1983.

**B. State Law Claims.**

 Magistrate Judge Hemann recommended that the Court grant summary judgment for the defendants on plaintiffs' state law claims because those claims are barred by sovereign immunity under Ohio law. Although the Magistrate Judge concluded that plaintiffs' claims were premised on negligence and therefore barred, there is evidence in the record to support plaintiffs' claim that the police officers acted in a reckless, if not malicious, manner. Such claims are not barred under the Ohio sovereign immunity statute. Ohio Rev.Code Ann. § 2744.03(A)(6)(b). Genuine issues of material fact preclude summary judgment for any of the defendants on these claims.

*CONCLUSION*

For the foregoing reasons, the Court finds that there are no genuine issues of material fact and all defendants are entitled to judgment as a matter of law on plaintiffs' claims that they were denied procedural due process and equal protection of the laws on the basis of their race. Individual defendants Altheide, Charles, and Adkins are also entitled to judgment as a matter of law with respect to the remainder of plaintiffs' constitutional claims, because they are qualifiedly immune from liability.

However, genuine issues of material fact preclude summary judgment for the City on plaintiffs' claims that they were denied substantive due process and equal protection of the laws on the basis of their sex and their status as victims of domestic violence. Genuine issues of material fact also preclude summary judgment for any of the defendants on plaintiffs' state law claims. This case will therefore proceed to trial against the City on plaintiffs' substantive due process and equal protection claims, and against all of the defendants on plaintiffs' state law claims.