Linda STEVENS, Plaintiff,

v.

TRUMBULL COUNTY SHERIFFS'
DEPARTMENT, et al.,
Defendants.

No. 4:98CV02520.

United States District Court,
N.D. Ohio.

Sept. 1, 1999.

John Douglas Liber, Mary A. Cavanaugh, Spangenberg, Shibley, Lancione & Liber, Cleveland, OH, for plaintiff.

Philip J. Weaver, Jr., Smith, Marshall, Weaver & Vergon, Cleveland, OH, James M. Brutz, Warren, OH, for defendants.

## MEMORANDUM OPINION AND ORDER

ECONOMUS, District Judge.

This case is before the Court upon the Motion of Defendants Trumbull County Sheriff's Department, Norman Olson, and Trumbull County 911 for summary judgment (Dkt.# 14) on Counts One and Three of Plaintiff's Complaint (Dkt.# 1).

Plaintiff, Linda Stevens ("Stevens"), in Count One of her Complaint alleges that Defendants violated her Constitutional rights under the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments. Plaintiff also asserts, in Count Three of her Complaint, that Defendants intentionally destroyed evidence relevant to this action. She is seeking compensatory and punitive damages in excess of $10,000,000. Jurisdiction is premised on 42 U.S.C. § 1983.

### FACTS

Plaintiff was seriously and permanently injured when her ex-boyfriend, Brian McKimmy ("McKimmy"), broke into her home, chased her, and shot her three times. Plaintiff and McKimmy were dating one another from approximately April 1997, to some time in the fall of that year. Beginning in October 1997, and continuing through early December 1997, Plaintiff attempted to avoid any contact with McKimmy. McKimmy, however, persisted in his efforts to renew his contacts with Plaintiff.

During the week preceding the incident giving rise to these proceedings, McKim-

my approached Plaintiff several times about renewing their relationship. At approximately 1:00 p.m. on December 21, 1997, McKimmy escalated the situation by making repeated phone calls to her home and continually driving around the street in front of her home.

Plaintiff, in response to McKimmy's conduct, telephoned 911 for emergency assistance. Plaintiff reached a dispatcher and relayed to her that she was being harassed by McKimmy via telephone and that he was continually driving by her residence. Plaintiff indicated that she wished to file a police report. Plaintiff identified herself and described McKimmy to the dispatcher who told her that she would "send someone over" (Pl.'s Br. in Opp'n. to Def.'s Mot. for Summ.J., at 5).

The following facts are not in dispute. The dispatcher contacted Defendant Lieutenant Deputy Sheriff Olson ("Olson") regarding Plaintiff's telephone call. Olson placed the dispatcher on stand-by and then resumed contact with her. Olson had a brief personal conversation regarding the day's holiday activities and then resumed the discussion of Plaintiff's situation. Olson informed the dispatcher that Plaintiff was not going to see a deputy that day. Upon completion of his conversation with the dispatcher, Olson telephoned Plaintiff. Plaintiff did not initially pick up the telephone when Olson called because Plaintiff was screening her calls to avoid speaking with McKimmy. When Plaintiff heard Olson identify himself, she picked up the telephone. Olson informed her that no one would be able to see her in person that day to take a report, but that he would take one over the telephone. Plaintiff agreed to give an oral report to Olson over the telephone. Olson instructed Plaintiff to lock herself inside the home to prevent McKimmy from gaining access.

At some point during the course of Plaintiff's conversation with Olson, McKimmy approached Plaintiff's house and attempted to forcibly gain access. Plaintiff told this to Olson over the telephone. Olson instructed Plaintiff to run screaming from her home to the safety of a neighbor's house. Olson then left his office and proceeded to Plaintiff's residence. Plaintiff immediately attempted to run from her home to safety. While Plaintiff was running from her home, McKimmy shot her three times. When Olson informed the dispatcher of the situation en route to Plaintiff's home, he referred to the call as "a domestic." (Def.Mot. for S.J. at 3; Pl.Br. in Resp. to Def.Mot. for S.J. at 9). After shooting Plaintiff, McKimmy turned his weapon on himself, ending his life. Tragically, Plaintiff was paralyzed from the waist down as a result of her injuries.

### LAW

Fed.R.Civ.P. 56(c) governs summary judgment and provides, in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions; answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the evidence submitted must be viewed in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

"The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial." *Morales v. American Honda Motor Co., Inc.*, 71 F.3d 531, 535 (6th Cir.1995). If the moving party meets this burden, then the non-moving party must present addi-

tional evidence beyond the pleadings. *Id.* The non-moving party must present more than a scintilla of evidence in support of his or her position. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment must be granted unless there is sufficient evidence favoring the non-moving party for a judge or jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. 2505.

### Substantive Due Process

■ The purpose of the Due Process Clause is to protect people from the State, not to ensure that the State protects them from each other. *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Therefore, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. 998.

■ However, the *DeShaney* Court recognized certain exceptions to the general rule that the State is not responsible for injury caused by private actors. The State may assume an affirmative duty to prevent harm when the State takes custody of a person and deprives them of their liberty so that they cannot protect themselves, or when the state affirmatively places the person in a position of danger or increases the danger to the person. *Id.* at 201, 109 S.Ct. 998. Plaintiff can only advance her substantive due process argument under the second *DeShaney* exception.

■ Plaintiff asserts that the danger to her was enhanced when the 911 dispatcher told her that an officer would be sent to her residence to take a report. Plaintiff states that had she known that an officer was not coming to her home, she would have immediately left the premises after ending her conversation with the 911 dispatcher. The Sixth Circuit, however, has held that "Liability under the state-created danger theory is predicated upon affirmative acts by the state which either create

or increase the risk that an individual will be exposed to private acts of violence." *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066 (6th Cir.1998). During the first 911 call, Plaintiff did not indicate an immediate threat of harm. Moreover, when Olson informed Plaintiff on the phone that an officer would not be coming over, Plaintiff again did not indicate an immediate threat of harm. It was only after Olson began taking the report that Plaintiff notified him that McKimmy was kicking down the door and that the situation had become violent.

■ The Court in *DeShaney* noted that "once a state learns that a third party poses a special danger to an identified victim, and indicates its willingness to protect the victim against that danger, a 'special relationship' arises between the State and victim, giving rise to an affirmative duty, enforceable through the Due Process Clause, to render adequate protection." *DeShaney,* 489 U.S. at 198 n. 4, 109 S.Ct. 998 (1989). Here, as Plaintiff never indicated a "special danger" to either the 911 operator or later to Olson, no affirmative duty arose based solely upon the 911 operator's statement that someone would be over to see her.

The Sixth Circuit in *Perry v. Wildes,* 149 F.3d 1184 (Table), 1998 WL 322651 (6th Cir.1998) is instructive as to whether Defendants violated Plaintiff's right to substantive due process. In *Perry,* as here, the plaintiffs alleged that the police department violated the substantive due process rights of their deceased daughter by failing to arrest her ex-boyfriend who later killed her. The court, in *Perry,* stated "we are unwilling to say that police response to a citizen's call for assistance subjects the officers to potential liability for creating a 'special danger' premised upon a heightened sense of security. It does not follow from police presence and opinions about the potential for danger that a constitutional violation has occurred." *Id.* at *3. The Sixth Circuit specifically found that the defendant police officer "did not place

any physical restraint on [plaintiff's] 'freedom to act on her own behalf,' or on the freedom of anyone else to act on her behalf." *Id.* The court additionally found that the evidence presented did not indicate that violence against the plaintiff was imminent. *Id.*

The instant case can be distinguished from *Smith v. City of Elyria*, 857 F.Supp. 1203 (N.D.Ohio 1994), upon which Plaintiff relies. In *Smith*, the court found that a genuine issue of material fact existed whether the Elyria police created or enhanced the danger to the victim. *Id.* at 1210. The victim telephoned the Elyria police department to report that her ex-husband, who was currently residing with her, would not leave as she requested. When the police arrived, they informed the victim that they could do nothing to remove her ex-husband and advised him to stay at the house despite the victim's repeated attempts to remove his personal belongings from her home. *Id.* After the police left the victim's home, her ex-husband stabbed and killed her. The *Smith* court held that "the police officers' *affirmative acts* created or increased the danger to [the victim]." *Id.* at 1210 (emphasis in original).

The facts of Smith can be distinguished from those before the Court. The police officers in *Smith* actually told the killer that he could stay at the home and did nothing to investigate the potential threat he posed to his ex-wife. *Id.* at 1210. The *Smith* court held that the ex-husband "used the apparent authority given to him by the police to remain in his ex-wife's home against her will, and later killed her." *Id.* In that situation, the actions of the police enhanced the danger to her.

Unlike the situation in *Smith*, the fact, here, do not support a claim that the police officers affirmatively acted to create or increase the danger to Plaintiff. Plaintiff did not indicate to the 911 dispatcher at the time of her initial call that an emergency situation existed. Olson responded to Plaintiff's complaint with the belief that an

emergency situation did not exist, and attempted to take a report from her. Furthermore, when Olson informed Plaintiff that no police personnel would be going to her home, Plaintiff chose to give the telephone report rather than leave the house. Since there is no evidence that Defendant was in fear of imminent harm, or a threat of imminent harm, a verbal promise that a police officer would be coming to Plaintiff's home is not enough to create a duty upon the Defendants to protect her against private harm.

In summary, this Court finds that Defendants' response to Plaintiff's 911 call did not create or enhance the danger to her. Defendants did nothing to give Plaintiff a heightened sense of security that subjects them to liability for violating her substantive due process rights. Furthermore, Defendants did not place any restraint on Plaintiff such that she was unable to act to protect herself. Plaintiff did not report a threat of imminent harm to her until it was too late for Defendants to respond. As such, Plaintiff has not established that Defendants' conduct violated her substantive due process rights. Therefore, this Court finds Defendants are entitled to judgment as a matter of law on Plaintiff's Substantive Due Process claim.

### Equal Protection

Plaintiff also asserts that Defendants violated her constitutional right to Equal Protection of the laws under the Fourteenth Amendment based on gender discrimination and discrimination against domestic violence victims.

### 1. Gender Discrimination

Plaintiff contends that Defendants, vis-a-vis the domestic violence response policy in Trumbull County, treated her differently based on her sex and thereby violated her right to equal protection. The Equal Protection Clause of the Fourteenth Amendment requires "that all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living*

*Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In order to support a claim for gender discrimination under the Equal Protection Clause of the Fourteenth Amendment, "a plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class". *Henry v. Metropolitan Sewer District,* 922 F.2d 332, 341 (6th Cir.1990) (*citing Johnson v. Morel,* 876 F.2d 477, 479 (5th Cir.1989)). Consequently, being a member of a protected class is an essential element in bringing a § 1983 claim in violation of the Equal Protection Clause. Plaintiff is a woman, and, as such, is a member of a protected class for the purpose of analyzing her gender discrimination claim.

■ The initial burden of proving a gender discrimination claim is on Plaintiff. Plaintiff must show, 1) either that the domestic violence policy was facially discriminatory or disproportionately impacted women; and 2) that the policy was intentionally discriminatory. See *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). Once Plaintiff has met the threshold inquiry, Defendants must prove that the policy substantially relates to an important governmental interest. *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1977). Where gender discrimination is in issue, the inquiry into whether a policy disproportionately and adversely affects women is twofold. First, the Court must determine "whether the statutory classification is indeed neutral in the sense that it is not gender based." *Feeney,* 442 U.S. at 257, 99 S.Ct. 2282. Second, if the classification is not explicitly or implicitly gender-based, the Court must determine "whether the adverse effect reflects invidious gender-based discrimination." *Id.*

Plaintiff, however, has not had the opportunity to inspect the policy for handling domestic violence situations in Trumbull County. Plaintiff cannot argue the merits of her claim without further discovery of Defendants' domestic violence response policy and procedures. Plaintiff must be allowed to do so before Defendants can again move for summary judgment.

## 2. *Discrimination Against Victims of Domestic Violence*

Plaintiff additionally contends that Defendants' domestic violence response policy discriminated against her on the basis of her status as a victim of domestic violence. Courts in the Sixth Circuit have recognized as valid equal protection claims by victims of domestic violence. *Blankenship v. City of Cleveland,* 145 F.3d 1330, 1998 WL 152774 (6th Cir.1998); *Hakken v. Washtenaw County,* 901 F.Supp. 1245 (E.D.Mich.1995); *Perrino v. City of Newton Falls,* 972 F.2d 348, 1992 WL 197328 (6th Cir.1992).

■ Domestic violence victims are not members of a class of persons subject to invidious discrimination. Therefore, Plaintiff must show that the domestic violence response policy did not have a rational relationship to a legitimate governmental interest. *Minnesota v. Clover Leaf Creamery,* 449 U.S. 456, 464, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) ("States are not required to convince the court of the correctness of their legislative judgments. Rather, 'those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision maker.' ") (citations omitted). Plaintiff cannot prove that a rational relationship between the response policy and a legitimate governmental interest did not exist if she cannot discover what the written or unwritten policy was at the time of the alleged violation.

■ As stated above, Plaintiff has not had a sufficient opportunity to develop the facts of her case. Without obtaining and analyzing the domestic violence response policy of Defendants, Plaintiff, as a threshold matter, cannot show that she

was treated differently as a victim of domestic violence compared to a non-domestic assault victim. Moreover, this Court cannot conclude, as a matter of law, that a rational basis for the policy did or did not exist without having the policy before it. As such, a genuine issue of material fact remains whether Defendants treated victims of domestic violence differently than victims of non-domestic disputes. Furthermore, a genuine issue of material fact exists as to whether such different treatment, if any, was rationally related to a legitimate governmental purpose.

### Qualified Immunity

Defendant Norman Olson asserts that he is entitled to judgment as a matter of law on the basis of qualified immunity.

Section 1983 provides a cause of action against any person, who, under color of state law, deprives an individual of any right, privilege, or immunity secured by the Constitution and federal law. 42 U.S.C. § 1983 (1979). However, when officials are sued in their individual capacities, they may be protected from liability for damages if their alleged wrongful conduct was committed while they performed a function protected by qualified immunity. See Cagle v. Gilley, 957 F.2d 1347, 1348 (6th Cir.1992).

"The first step in a qualified immunity analysis is whether, based on the applicable law, a constitutional violation occurred." Centanni v. Eight Unknown Officers, 15 F.3d 587, 589 (6th Cir.), cert. denied, 512 U.S. 1236, 114 S.Ct. 2740, 129 L.Ed.2d 860(1994); Silver v. Franklin Township, 966 F.2d 1031, 1035 (6th Cir. 1992). In determining whether or not a right is clearly established, courts "look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to

decisions of other circuits." Buckner v. Kilgore, 36 F.3d 536, 539 (6th Cir.1994).

■■■■ If the right was clearly established, the court must determine whether "the plaintiff has alleged facts supported by sufficient evidence to indicate what [the officer] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights." Adams v. Metiva, 31 F.3d 375, 387 (6th Cir.1994). Individual claims of immunity must be analyzed on a fact-specific, case-by-case basis to determine whether the constitutional rights were so clearly established when the alleged misconduct was committed that any official in the defendant's position would understand that what she was doing violates those rights. See Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Plaintiff cites Stemler v. Florence, 126 F.3d 856 (6th Cir.1997) and Smith v. City of Elyria, supra, to support her claim that a constitutional violation occurred. Neither case, however, establishes a clear constitutional right of which Olson should have been aware at the time of the alleged violation. In Stemler, the police placed the plaintiff into the car of her drunken and belligerent boyfriend under the threat of arrest. The Sixth Circuit found that the plaintiff was "rendered unable to protect herself by virtue of [the officer's threats and conduct]." Stemler, 126 F.3d at 868.[1] The police officer's conduct toward the plaintiff in Stemler deprived her of any ability to voluntarily choose how to respond to her assailant. Unlike Stemler, Defendant Olson's conduct did not deprive Plaintiff of her ability to make a voluntary choice with regard to her response to McKimmy's threats. See Stemler, 126 F.3d at 868. Olson, therefore, could not have known that his action, or inaction,

---

1. The Stemler court distinguished the facts of that case from Foy v. City of Berea, 58 F.3d 227 (6th Cir.1995), where the plaintiff, who was intoxicated, was told to get in his car and leave a dormitory party. Foy, 58 F.3d at 230. Foy was killed forty-five minutes later while driving his car. The court held that "there was no restraint on [Foy's] liberty that had caused him to keep driving". Id.

violated Plaintiff's substantive due process rights under clearly established law.

 Additionally, this Court finds that there are no definitive Sixth Circuit or Supreme Court decisions determining that police policies for handling domestic disputes may violate domestic violence victims' rights to equal protection on the basis of their sex or status as victims of domestic violence. Despite Plaintiff's assertion, *Smith* does not clearly establish an equal protection right that could have been violated by the police in treating their calls for assistance differently than calls in non-domestic situations. See *Smith*, 857 F.Supp. at 1214. Because no clearly established constitutional right existed at the time the alleged violation occurred, Defendant Olson is entitled to qualified immunity.

### State Claims

This Court finds that genuine issues of material fact exist regarding Count Three of Plaintiff's Complaint (Dkt.# 1).[2]

### CONCLUSION

Therefore, Defendants' Motion for Summary Judgment (Dkt.# 14) on the substantive due process claim in Count One is **GRANTED.** Summary judgment on the equal protection claim in Count One is **GRANTED** in part with respect to Defendant Norman Olson in his individual capacity based on qualified immunity, and **DENIED** in part with respect to Defendants Trumbull County Sheriff's Department and Trumbull County 911.

Furthermore, summary judgment on the claim of destruction of evidence in Count Three is **DENIED.**

**IT IS SO ORDERED.**

---

2. Defendants did not move for summary judgment on Count Two of Plaintiff's Complaint (Dkt.# 1).