**Theresa SHEETS, Plaintiff,**

v.

**Sgt. Howard MULLINS,
et al., Defendants.**

**No. C2–98–170.**

United States District Court,
S.D. Ohio,
Eastern Division.

Aug. 15, 2000.

James McNamara, Columbus, OH, for plaintiff.

Mark O. Landes, Isaac, Brant, Ledman & Teetor, Columbus, OH, for defendant.

### OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court for consideration of the Defendants' Motion for Summary Judgment. (Doc. # 29) For the reasons that follow, the motion is granted in part and denied in part.

### I.

Plaintiff in the case at bar is the mother of a deceased child, Tiffany Jean Montgomery. The Plaintiff and one Roger Montgomery lived together in Gallia County, Ohio. Following an episode of domestic violence, Roger Montgomery shot and killed Tiffany Jean Montgomery and thereafter killed himself.

Plaintiff asserts three separate claims under 42 U.S.C. § 1983[1] against the Gallia County Sheriff's Department, the Sheriff of Gallia County, together with three individual deputies employed by the Sheriff's Department. The Plaintiff contends that the Defendants violated her rights to substantive due process, procedural due process, and equal protection under the United States Constitution, as more fully explored below. The following factual scenario is gleaned in large part from the deposition transcripts submitted to the Court.

The facts surrounding this unmitigated tragedy began on Sunday morning, February 16, 1997. According to Ms. Sheets, Montgomery put a knife to her stomach and held her at gunpoint. (*Deposition of Theresa Sheets,* hereinafter referred to as "*Sheets Deposition,*" at 31). Montgomery threatened to kill her and her children, smashed up their home, and knocked over the refrigerator. Roger Montgomery thereafter called the sister of the Plaintiff and asked her to come and pick up Theresa Sheets. The Plaintiff's sister transported Ms. Sheets to the home of Jerry Roach, her nephew. (*Id.* at 27–28). Roach then called the Sheriff's Department and made a report of domestic violence. (*Id.*). Sergeant Howard Mullins came to Roach's residence and interviewed the Plaintiff. (*Id.* at 31).

According to Sheets, she told Defendant Mullins that her child, Tiffany Montgomery, was in danger. She described to him the threats Montgomery had made to hurt the child and the fact that he had held her

---

1. 42 U.S.C. § 1983 states in pertinent part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

at gunpoint, placed a knife in her stomach and destroyed various household items during his rage. (*Id.* at 31–32).

According to the Plaintiff, she advised Mullins that her daughter was at the home of one Shirley Lilly, the sister of Roger Montgomery. On deposition, the Plaintiff testified as follows:

Q: Did he ask you about where Tiffany was?

A: Yes.

Q. What did he ask you?

A: He asked me where was Tiffany and I told him that Tiffany was at Shirley Lilly's—

Q: And what did he say?

A: —and that I wanted to go get her. He said to just wait.

Q. Did he call the Lilly's house?

A: No.

Q. What did he say to wait until?

A: To wait until I go to court.

(*Sheets Deposition* at 33)

In contrast, Sgt. Mullins testified that the Plaintiff told him that Roger Montgomery had taken the baby to Columbus. (*Deposition of Sgt. Howard Mullins,* hereinafter referred to as *"Mullins Deposition,"* at 57–59). Mullins also testified that after being so advised by Sheets, he traveled to Montgomery's residence and noted that Montgomery's vehicle was gone. (*Id.* at 60). After failing to locate Montgomery at his residence, Mullins made no further effort to seek out or arrest him. (*Id.* at 61). According to Mullins, he concluded that Montgomery was in Columbus. Mullins made no effort to physically reunite Tiffany with her mother. (*Id.*).

Further, Mullins failed to comply with a host of requirements imposed upon police officers by the Ohio legislature. Ohio law provides for what is termed a "preferred arrest" policy, as set forth in O.R.C. § 2935.03(B)(3)(b). Further, if a peace officer does not arrest and detain a person whom the officer has reasonable cause to believe committed domestic violence, the officer is required to articulate, in a written report, the reasons for not arresting and detaining such person until a warrant can be obtained. O.R.C. § 2935.03(B)(3)(c). Finally, if the officer responds to a report of alleged domestic violence involving the use or threatened use of a deadly weapon, the officer is required under Ohio law to seize the deadly weapon as contraband. From the record presented, Sgt. Mullins failed to comply with any of these provisions of the Ohio domestic violence law.

In his initial meeting with the Plaintiff, Sgt. Mullins instructed Ms. Sheets that she could, if she wished, file criminal charges against Mr. Montgomery on the following Tuesday, since Monday was a holiday. (*Mullins Deposition* at 62). Other than a one time attempt to locate Montgomery at his residence, Mullins made no other attempt to find the child or Montgomery. (*Id.* at 63). Further, Mullins admits that he did not, at the end of his shift, indicate to oncoming deputies or their Sergeant that Montgomery had threatened to kill the child over whom he had physical custody. (*Id.* at 78–79).

Plaintiff asserts that Mullins directed her not to use self-help to obtain physical custody of her daughter, notwithstanding the fact that as a parent of the child, she had the right to immediate custody. (*Sheets Deposition* at 33; 37). Plaintiff remained with her nephew over the next several days and did attempt, through legal process only, to obtain legal custody of her daughter. (*Id.* at 33). The next day, Monday, February 17, 1997 was a legal holiday. On Tuesday, February 18, 1997, Sheets filed charges against Montgomery with the City Solicitor and also sought temporary custody of her daughter. (*Id.* at 38–39). Attorney Phyllis Rowan was assigned as Plaintiff's counsel. (*Id.* at 42).

On the same day, February 18, 1997, Theresa Sheets was designated as the legal custodian of the minor child and temporary custody was awarded to her by the

Gallia County Juvenile Court. Rowan and Sheets took the temporary custody order to the Gallia County Sheriff's Department. (*Deposition of Phyllis Rowan,* hereinafter referred to as "*Rowan Deposition,*" at 13–14). Ms. Rowan requested that the Sheriff's Department take physical custody away from Montgomery and place the minor child with her mother. (*Id.* at 14–15). Sergeant Martin of the Gallia County Sheriff's Department indicated that, in his view, the custody order did not give the Department legal authority to take physical control of the child as the order lacked the requisite specificity for a forceful taking of an infant. (*Deposition of David Martin,* hereinafter referred to as "*Martin Deposition,*" at 41–42). The Sergeant also advised that the proper paperwork had not been received from the City Solicitor's Office and that no warrant had been submitted to the Sheriff's Department pursuant to which the Department could arrest Roger Montgomery. (*Id.* at 50–51). At the close of business hours on February 19, 1997, Ms. Sheets had been advised by the Sheriff's Office that the paperwork authorizing the arrest of Montgomery had not been received and that the order she obtained from the Juvenile Court could not be enforced by a deputy sheriff. (*Id.* at 52).

The next day, Roger Montgomery telephoned the residence of Sgt. Mullins. (*Mullins Deposition* at 65). Mullins and Montgomery were long-time personal friends who had grown up together and saw each other on a regular basis. (*Id.* at 24–26). Montgomery called Mullins at approximately 7:30 p.m. on February 19 and asked Mullins if a warrant had been issued for his arrest. (*Id.* at 65). According to Mullins' own testimony, Mullins advised Montgomery to simply check with the Municipal Court in the morning. (*Id.*). Montgomery also asked Mullins about the steps he should take to obtain custody of the child. Although Mullins testified that if he had found Montgomery on the preceding Sunday he would have arrested him, Mullins made no effort to determine

Montgomery's location in order to arrest him or to seek physical custody of the child that Wednesday evening. (*Id.* at 62; 65).

Mullins also testified that he did not believe from his one time meeting with Theresa Sheets that the baby was in any imminent danger. (*Id.*). Because he had a long-time relationship with Montgomery and because he was not aware of any prior violence or criminal activity on Montgomery's part, Mullins did not believe the claims made by the Plaintiff that Montgomery had pulled a gun on her or threatened her with a knife. (*Mullins Deposition* at 56–57). Mullins also admitted that, in 1991, he had himself been convicted of domestic violence. (*Mullins Deposition* at 9). He specifically testified that he did not believe that Sheets was truthful in her claims against Montgomery. (*Id.* at 63).

On the following morning, Thursday, February 20, 1997, Attorney Rowan obtained from the Gallia County Juvenile Court a custody order which included the language the Sheriff's Department required before it would enforce a physical taking of the child. (*Rowan Deposition* at 23–25). Before that order could be enforced, Montgomery voluntarily appeared in the Gallipolis Municipal Court on an initial appearance with regard to charges filed against him by Theresa Sheets alleging that he committed domestic violence against her. He was released on his own recognizance, subject to the provisions of a temporary protective order in favor of Ms. Sheets, pursuant to O.R.C. § 3113.31. The Municipal Court refused to order Montgomery to give up physical custody of the child, finding the issue as being within the exclusive jurisdiction of the Gallia County Juvenile Court.

On that same afternoon, four days after the Plaintiff made her initial complaints to Sergeant Mullins, Montgomery shot Tiffany Jean Montgomery in the head, set fire to his residence, and then turned the gun upon himself. (*Sheets Deposition* at 49–50).

## II.

The procedure for considering whether summary judgment is appropriate is set forth in Federal Rule of Civil Procedure 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.* 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identifies a number of important principles in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. 2505). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which is seeks to rely to create a genuine issue of material fact.

## III.

All of the named Defendants have moved for summary judgment with respect to the claims Plaintiff asserts. Theresa Sheets brings the action on behalf of herself and as the Administrator of the Estate of Tiffany Jean Montgomery, deceased. In this collective capacity, she asserts three independent claims against the Defendants, all of which arise under the Fourteenth Amendment to the United States Constitution[2]. First, she claims that the Defendants acted in a manner

---

**2.** The Fourteenth Amendment states in part: All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. Am. XIV.

that violated the Plaintiff's right to substantive due process. Second, she asserts that the Defendants acted in a manner to deprive her of her right to procedural due process by failing to enforce Ohio's domestic relations laws. Third, the Plaintiff contends that the Defendants acted in a discriminatory manner based on her status as a female and as a victim of domestic violence, thereby depriving her of equal protection under the law. The Court will address each of these claims in turn, together with the assertions of the Defendants that they are individually entitled to qualified immunity and that no liability should attach to the public entity.

## A. PLAINTIFF'S CLAIMS

### 1. SUBSTANTIVE DUE PROCESS

An analysis of Plaintiff's claims under a substantive due process theory begins with the case of *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The plaintiff therein was the mother of a child who had been severely beaten and permanently injured by his father. Prior to the assault, the Winnebago County Department of Social Services investigated claims that the child had been abused by his father. After obtaining temporary custody of the child, the agency nonetheless returned the child to the care and custody of his father. The mother of the child brought an action under § 1983 alleging that the Department of Human Services had deprived Joshua of his right to substantive due process by failing to intervene to protect him against the risk of violence which the agency knew or should have known.

The United States Supreme Court rejected the theory so advanced by the *De-Shaney* and held:

> As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

*DeShaney,* 489 U.S. at 196, 109 S.Ct. 998. The Court reasoned that, while the defendant caseworkers may have been aware of dangers faced by the child, the state agency did not create such danger, nor did the defendants undertake any act that rendered the child more vulnerable to such dangers. The Court characterized the Due Process Clause as "a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.* at 195, 109 S.Ct. 998. The Court did, however, recognize some important exceptions to the general rule of no liability for the state's failure to prevent harm from third parties. In this regard, the Court stated:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*Id.* at 200, 109 S.Ct. 998. (citations omitted).

As explained in *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066 (6th Cir. 1998), "the [Supreme] Court left open the possibility that the state may be liable for private acts which violate constitutionally protected rights despite the absence of a special relationship." In *Kallstrom,* the United States Court of Appeals for the Sixth Circuit expressly approved what it termed "a state-created-danger theory of liability." *Id.* As the Court further noted, "while the state generally does not shoulder an affirmative duty to protect its citizens from private acts of violence, it may not cause or greatly increase the risk of

harm to its citizens without due process of law through its own affirmative acts." *Id.*

■ The Sixth Circuit appropriately holds that a *DeShaney* analysis requires a "fact-specific inquiry" as to whether a public official acted in a manner to cause a "state-created danger." *Perry v. Wildes,* No. 97–3372, 1998 WL 322651 at *3 (6th Cir. May 18, 1998). A review of the Sixth Circuit cases interpreting *DeShaney* delineates the limits of liability imposed on local law enforcement officials for violence perpetrated by third parties. The caselaw also addresses the defense of qualified immunity, which measures the state of the law as of the time the events giving rise to the particular lawsuit. The Court will now outline the relevant Sixth Circuit authority.

In *Duvall v. Ford,* No. 98–5777, 1999 WL 486531 (6th Cir. July 1, 1999), the plaintiff had been shot by her former boyfriend who had escaped three weeks earlier from a court approved work release program. Plaintiff's assailant had been previously arrested for assaulting the plaintiff's daughter; he was thereupon sentenced to the supervised work release program from which he escaped. Three weeks later, the assailant shot the plaintiff, causing her to be permanently disabled. The Sixth Circuit concluded that the Plaintiff failed to demonstrate that the defendant law enforcement official increased the risk of harm to her. The Court held that "if a state actor helped to create the danger or circumstances that caused the plaintiff's injury, the state may be held liable under the Due Process Clause." *Id.* *3. In that case, the Court concluded that the defendants had not undertaken any act which increased the risk of danger to the plaintiff.

In *Perry v. Wildes, supra,* the Sixth Circuit again confronted a case of domestic violence, which resulted in the death of one Brenda Perry. The decedent had been dating one Donald Smith for a year and a half when a physical confrontation occurred on July 29, 1993. She thereafter filed criminal charges against him. An officer in the township of Poland, Ohio was aware of a warrant for the arrest of Donald Smith, but had not yet received the paperwork. The officer advised Smith to leave Brenda Perry alone, but did not arrest him. On the next day, Smith appeared at the home of a friend of the decedent who thereupon summoned the same police department. Smith's mother then called Ms. Perry's home and advised that her son had threatened to kill himself if the charges were not dropped. The decedent's parents called the police department and demanded that Smith be arrested. Instead, two officers came to the Perry home and stayed on the front porch for some time hoping to see Smith. Thereafter, the officers left the home. Smith then came to the home and fatally shot Brenda Perry.

In its analysis, the Court of Appeals observed that the defendants did not place any physical restraint on Perry's freedom to act on her own behalf. She remained free to leave her home. The Court concluded that the police officers did not act in a way to create any additional danger to the decedent; thus, the Court found no substantive due process violation.

In *Davis v. Brady,* 143 F.3d 1021 (6th Cir.1998), the plaintiff was taken into police custody after having arrived at a homeless shelter in an intoxicated state. Upon becoming unruly and breaking a window, the police removed the plaintiff from the shelter and drove him a substantial distance to the edge of town at which point he was taken from the police cruiser and left upon a four lane highway. Subsequently, plaintiff was struck by a motor vehicle and suffered severe injuries. The Court of Appeals noted:

> Significantly, we have previously suggested that this language in *DeShaney* stands for the proposition that "a duty to protect can arise in a noncustodial setting if the state does anything to render an individual more vulnerable to

danger." Unlike the situation in *DeShaney,* moreover, the defendant officers in this case placed Davis in a more dangerous situation than he was prior to their interference, when they drove him outside the Flint city limits and abandoned him on a dark and dangerous highway in an unfamiliar area.

*Id.* at 1025, quoting *Gazette v. City of Pontiac,* 41 F.3d 1061, 1065 (6th Cir.1994). The Court concluded that the facts, as alleged by the plaintiff, constituted a violation of his substantive due process rights.

In *Stemler v. City of Florence,* 126 F.3d 856 (6th Cir.1997), one Connie Black was involved in an altercation with her boyfriend. After securing a ride with a female friend in an attempt to get away from her boyfriend, the boyfriend chased the vehicle for an extended distance. Ultimately, police officers stopped both vehicles. Apparently, the officers believed the story of the boyfriend that his girlfriend was being kidnapped by a lesbian. The police failed to take any blood alcohol tests of the boyfriend. Instead, the officers physically placed the decedent, who was clearly under the influence of alcohol, in the vehicle of her boyfriend. Shortly thereafter, the boyfriend crashed the vehicle and killed Ms. Black.

The Court of Appeals found that such conduct by the officers violated Black's right to substantive due process. The Court emphasized that she was rendered incapable of protecting herself by her physical placement in the truck by the officers. Rather than simply failing to protect her, the officers acted affirmatively in a manner that increased the risk of harm to her. *Id.* at 869–70.

In *Garrett v. Gilless,* No. 93–6197, 1995 WL 16810 (6th Cir. Jan.17, 1995), the plaintiff, Sheila Garrett, filed for divorce from her husband, Clyde Garrett, a deputy sheriff. Mr. Garrett had become increasingly violent during the course of the marriage. He made repeated threats to kill his wife, a number of which were reported to the same sheriff's department where he was employed. Subsequently, Mr. Garrett entered the home with guns in both hands, one of which was the service revolver issued to him by his department. He shot the plaintiff in the face, and ultimately killed himself and his daughter.

The Court of Appeals concluded that the facts presented involved no state-imposed restraint upon Ms. Garrett which prevented her to act to protect herself against private violence. Further, the Court concluded that the defendant officers did not act to increase the risk posed to Mrs. Garrett. *Id.* at *2. Consequently, the Sixth Circuit declined to find state liability.

In *Gazette v. City of Pontiac,* 41 F.3d 1061 (6th Cir.1994) an action was brought on behalf of the decedent who had been abducted from a car wash, placed in the trunk of a car, and ultimately died from starvation and dehydration. The decedent was well known to the police department in Pontiac, Michigan. On a number of prior occasions, she had been listed as missing, while apparently on an alcoholic binge. The decedent's mother called the police on the morning of her abduction and advised police that she was missing. The police advised the mother that they had investigated the car wash for evidence of the decedent's disappearance, when in fact they had not. The decedent's mother asserted that despite the police's failure to investigate the car wash, the same contained obvious evidence of a physical and sexual assault. The decedent's mother also gave the police information concerning the decedent's bank account. Later, it was discovered that a bank camera had videotaped her daughter's abductor withdrawing all the funds from her account.

The Sixth Circuit analyzed the case under *DeShaney, supra,* and noted:

> The final part of the *DeShaney* analysis requires us to ask whether the City or the police officers rendered Bandy any more vulnerable to the danger she was already in by their actions. In *Freeman v. Ferguson,* 911 F.2d 52 (8th Cir.1990),

the Eighth Circuit recognized the possibility of a constitutional duty to protect where state actions increase the vulnerability of an individual to private acts of violence "beyond a level it would have been at absence state action."

*Gazette* at 1065, quoting *Freeman v. Ferguson*, 911 F.2d at 55. The Court concluded that the failure of the police to more vigorously investigate a missing person report did not state a claim under *DeShaney* for a violation of substantive due process.

■ From these cases, it is clear that the Sixth Circuit has interpreted *DeShaney, supra*, as creating several exceptions to the general rule that a state's failure to protect an individual against private acts of violence does not constitute a violation of the Due Process Clause. The first exception arises if the state has restrained an individual's liberty through institutionalization or incarceration and fails to provide for basic human needs, including reasonable safety. The second arises when the state, or a person acting on its behalf, acts in a way to significantly enhance the danger to a particularized person, in a manner which would not have occurred absent such state action.

The same principles have been applied in several district court cases arising within the Sixth Circuit. For example, in *Stevens v. Trumbull County Sheriffs' Dept.*, 63 F.Supp.2d 851 (N.D.Ohio 1999), the plaintiff was permanently injured by her former boyfriend who broke into her house and shot her. The week prior to the incident, plaintiff had telephoned the local emergency 911 system. The dispatcher advised her that an officer would be sent to her residence. Thereafter, the dispatcher contacted one Lieutenant Olson who informed the dispatcher that a deputy would not be able to meet with the plaintiff that day. Olson subsequently telephoned the plaintiff to advise her that he would take a report over the phone, but would not see her in person. During this conversation, the plaintiff's former boyfriend came to the house and began kicking in the front door. Olson then advised plaintiff to run from her house, scream in a loud voice, and seek shelter with her neighbor. While following Olson's instructions, the plaintiff was shot three times by her former boyfriend.

The district court analyzed the case under the parameters of *DeShaney, supra*. The plaintiff claimed that had she known the officer was not coming to her house after the first call with the 911 dispatcher, she would have left her residence. The district court observed, however, that the plaintiff did not inform the dispatcher that her former boyfriend was dangerous and did not indicate an immediate threat of harm. *Id.* at 854. Further, the Court concluded that a verbal promise that a police officer would be coming to the plaintiff's home was not enough to create a duty upon the defendant sufficient to impose liability. *Id.* at 855.

In *Smith v. City of Elyria*, 857 F.Supp. 1203 (N.D.Ohio 1994), one Karen Guerrant was stabbed twelve times and killed by her ex-husband. The two had been married twice but were divorced at the time of the incident leading to her demise. After the second divorce, she permitted her ex-husband to move into the guest room of her home. After an argument ensued, the decedent demanded that her ex-husband leave the residence. After he refused, she contacted the Elyria Police Department which refused to order him to leave the premises, notwithstanding the fact that the parties were no longer married and that he had no property interest in the residence. After the police left, the ex-husband murdered his former wife.

The District Court concluded that the defendant officers did not merely fail to perform their duties, an omission which would not result in liability under *DeShaney, supra*. *Id.* at 1210. Instead, the Court concluded that the plaintiff had presented evidence of a genuine issue of material fact as to whether the police officers affirmatively increased the danger to the decedent by telling the ex-husband that he

did not in fact have to leave the residence and further telling him to go back if his ex-wife tried to throw him out. *Id.*

Finally, in *Siddle v. City of Cambridge,* 761 F.Supp. 503 (S.D.Ohio 1991), the district court concluded that the plaintiff had failed to establish that the defendant police officers violated her substantive due process rights. The plaintiff had been assaulted and harassed by her husband over an extended period of time during which police officers were asked to respond. The fact that she had obtained a state protective order against her husband did not, by itself, the Court concluded, render local police officers liable for injuries or harm she suffered thereafter at the hands of her husband. Thus, the Court found that under the Due Process Clause of the Fourteenth Amendment, the state had no duty to protect the plaintiff.

 The foregoing authority illustrates that the Sixth Circuit and the District Courts within the Sixth Circuit hold that, under *DeShaney,* a police officer or a law enforcement agency cannot be liable pursuant to § 1983 for simply failing to protect a citizen from violence visited by a third party. Similarly, a failure to respond in a timely fashion, to arrest upon obvious probable cause, and to prosecute a criminal wrongdoer does not impose liability under § 1983. Instead, the above-cited cases stand for the proposition that a duty to protect arises in a noncustodial setting only if a person acting under color of state law renders an individual more vulnerable to danger. *See e.g., Gazette v. City of Pontiac,* 41 F.3d at 1065. Further, liability may only attach in a noncustodial setting if the danger created by the public actor increased the particularized risk to a specific individual. *See Duvall v. Ford, supra.*

 Applying these principles to the case at bar, this Court finds that the rec-ord presented poses several genuine issues of material fact which can only be resolved by a jury. On the day that Theresa Sheets reported instances of domestic violence to the Defendants, she was visited by the Defendant, Sergeant Mullins. According to her deposition testimony, she specifically told Mullins that Montgomery had assaulted her and threatened her with a gun and knife. She also told him, as Mullins noted in his own report, that Montgomery claimed he was going to kill her and her children. Further, Theresa Sheets testified on deposition that her baby was, at that time, with Shirley Lilly, the sister of Roger Montgomery. (*Sheets Deposition* at 33).

During her discussion with Sgt. Mullins on Sunday, February 16, 1997, Ms. Sheets specifically told Mullins that she wanted to pick up her baby from Shirley Lilly. According to Sheets' testimony, Mullins told her that she would have to wait until she went to court, notwithstanding the fact that the child was with her aunt, and not the putative father [3]. Further, Mullins admits that he told Theresa Sheets that he would look for Montgomery. He also indicated to her that he believed the baby was safe. (*Mullins Deposition* at 62; 65).

After receiving the instructions from Mullins that she not attempt to retrieve the baby until she went to court, Theresa Sheets, from the record in this case, made no efforts at lawful self-help in retrieving her child. Instead, she spent the next four days attempting to obtain an enforceable custody order which the Gallia County Sheriff's Office would actually enforce. (*See Rowan Deposition, supra*).

From these facts, the Court finds that a jury could reasonably conclude that Sergeant Mullins directed Theresa Sheets to refrain from any self-help while he looked for Roger Montgomery and she obtained a court order of custody. Nothing under Ohio law would have, of course, prevented

---

**3.** Mullins denies that the baby was with Shirley Lilly at the time he interviewed Theresa Sheets. (*Mullins Deposition* at 57–59). For purposes of summary judgment, this demonstrates a genuine issue of material fact.

Theresa Sheets from obtaining physical custody of her child from the aunt who was providing daycare services. Further, under Ohio law, as the mother of the child, Theresa Sheets had at least equal rights to the physical custody of the child as did the child's father. *See e.g.,* O.R.C. § 3109.03. The record reflects that Roger Montgomery and Theresa Sheets were never married. Roger Montgomery has been referred to by the parties during the course of this case as the father of Tiffany Montgomery, although nothing in the record indicates he had legally acknowledged the child, that paternity had been established, or that Mullins had personal knowledge that Montgomery was the father of the child. Mullins' report refers to Montgomery as Sheets "live-in boyfriend." (*See Exhibit 1* attached to *Plaintiff's Memorandum contra Defendants' Motion for Summary Judgment*). The Court does note, however, that if Montgomery had not been acknowledged as the father of the child, his rights to physical custody of the child were both clearly subordinate to those of the mother, Theresa Sheets and, at best, inchoate under Ohio law. *See* O.R.C. § 3111.01, *et seq.*

From the record in this case, a jury could also conclude that Sergeant Mullins told the mother of Tiffany Montgomery, Theresa Sheets, that she was prohibited from retrieving physical custody of her daughter from the child's aunt, who was also the sister of Mullins' good friend, Roger Montgomery. As the mother of the child, Ms. Sheets had legal rights far superior to those of the aunt, Shirley Lilly. Sheets would have been lawfully entitled, in the absence of Mullins' directive, to retrieve the child in an effort to ensure that her daughter was not harmed by Roger Montgomery. Further, Mullins has offered no evidence to establish that Roger Montgomery had any legal claim whatsoever to custody of the child, given the fact that he was not married to the child's mother at the time of her birth. Under Ohio law, a father who has not acknowledged the child or been found through a

parentage action to be a parent of the child, has no right to legal custody, particularly when the same is opposed by the undisputed mother of the child. *See e.g.,* O.R.C. § 3111.03.

This Court concludes there is a genuine issue of material fact as to whether Sergeant Mullins rendered Tiffany Montgomery more vulnerable to danger through his actions in preventing her mother from seeking physical custody of her. In addition, upon the end of his shift, Mullins did not advise other officers of Montgomery's conduct. Consequently, any other officer was thereby precluded from intervening in what later became a catastrophe. Further, Mullins received a phone call from his friend, Roger Montgomery, on the night before the baby's murder. Mullins failed to instruct Montgomery to bring the child to her mother and made no effort to otherwise protect the baby from the man who three days earlier was alleged to have threatened to kill the child and who did in fact kill her the next day. While these latter two facts, even if credited by a jury, might not in and of themselves render Mullins liable under *DeShaney*, in conjunction with his directive to Sheets that she not seek return of the child on her own, the Court finds that these two facts pose a genuine issue as to whether Sgt. Mullins' actions greatly increased the risk of serious harm or death to the minor child.

In the Court's view, a jury could even find that the child's safety would have been enhanced, given the conduct of Mullins, if Theresa Sheets had never reported the acts of domestic violence and the threats to her and her children. Sheets would then have been at liberty to seek a return of the child from the baby's aunt. Instead, Mullins directed her not to seek physical custody of the child and thereafter made no effort to return the child to her, notwithstanding the notation in his own report that Montgomery had threatened to kill the baby. In light of these circumstances, the Court finds that there

is sufficient evidence for a jury to consider the claim of Theresa Sheets that Sergeant Mullins violated her right to substantive due process under the Fourteenth Amendment to the Constitution.

■ The Court further concludes that the Motion for Summary Judgment filed by Sheriff James D. Taylor, Sergeant David Martin, and Deputy Jimmy Spears as to Plaintiff's claims that the Defendants deprived her of substantive due process is well taken. Construing the facts of this case most favorably in favor of the Plaintiff, the record only reflects that these Defendants may have failed to protect Tiffany Montgomery by failing to promptly arrest and prosecute Roger Montgomery. The record reflects no facts upon which a reasonable jury could conclude that these particular Defendants acted in a way to increase the danger to Tiffany Montgomery from Roger Montgomery. The claims against these Defendants are, in reality, a claim that they did not act to protect the child, a claim clearly rejected by *DeShaney*, so long as the state actors in no way increased the danger to the victim.

Thus, as it relates to Defendants Taylor, Martin and Spears, Plaintiff's claim that she and Tiffany were deprived of the right to substantive due process, the Motion for Summary Judgment is granted.

## 2. PROCEDURAL DUE PROCESS

The Plaintiff also asserts that the Defendants violated her right to procedural due process by failing to enforce Ohio law relating to domestic violence. As Plaintiff correctly argues, Ohio law requires that the Defendants arrest Roger Montgomery or, at a minimum, document the reasons why an arrest did not issue. O.R.C. § 2935.03(B)(3)(b). The Defendants took neither course of action in this case. Further, the Defendants did not advise Theresa Sheets that she could sign a written statement alleging domestic violence which would then, under Ohio law, establish reasonable grounds for the officers to believe that an offense of domestic violence had

been committed and which would authorize an immediate arrest. O.R.C. § 2935.03(B)(3)(a)(1). Further, Ohio law required the officers to seize as contraband any deadly weapon allegedly used by a perpetrator of domestic violence, which would include the rifle which Theresa Sheets claimed that Montgomery had used to threaten her. O.R.C. § 2935.03(B)(3)(h).

■ The record before this Court is replete with evidence demonstrating that the defendants failed to comply with the mandatory requirements of the Ohio domestic violence law. Unfortunately, for the plaintiff, violations of state law, in and of themselves, do not establish a deprivation of constitutional rights. As the United States Court of Appeals for the Seventh Circuit held in *Archie v. Racine*, 847 F.2d 1211, 1217 (7th Cir.1988), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989), "[a] state ought to follow its law, but to treat a violation of state law as a violation of the Constitution is to make the federal government the enforcer of state law. State rather than federal courts are the appropriate institutions to enforce state rules." *Accord Pyles v. Raisor*, 60 F.3d 1211 (6th Cir.1995).

■ The Plaintiff herein asserts that the Ohio domestic violence law creates a property interest which supports a procedural due process claim. For state law to create a property interest under the Fourteenth Amendment, a citizen must have a legitimate claim of entitlement to the rights enacted by the state. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). As noted by Judge Wells in *Smith v. City of Elyria*, 857 F.Supp. 1203 (N.D.Ohio 1994), in a case involving domestic violence resulting in a homicide, Ohio law does not provide a constitutionally protected property interest sufficient upon which to base a procedural due process claim. Further, while Ohio law includes a preferred arrest policy, an officer still has discretion to forego an

arrest, while explaining such decision in written detail, thereby diminishing any claim that Ohio law established an entitlement of constitutional dimensions.

As the Court finds no protected property interest in this case, the Court concludes that the Plaintiff's claim for a violation of procedural due process must fail. The Defendants are therefore entitled to summary judgment on Plaintiff's claim that her right to procedural due process was violated [4].

## 3. EQUAL PROTECTION CLAIM

■ The Plaintiff claims that the Defendants acted to deprive her of equal protection of the law by denying the same treatment to women and victims of domestic violence as treatment accorded to other citizens. A number of cases have found that victims of domestic violence and women may maintain a claim under the Equal Protection Clause of the Fourteenth Amendment. *See e.g., Hakken v. Washtenaw County,* 901 F.Supp. 1245 (E.D.Mich. 1995); *Smith v. City of Elyria, supra; Cellini v. City of Sterling Heights,* 856 F.Supp. 1215 (E.D.Mich.1994), and *Siddle v. City of Cambridge, supra.* As explained in *Hakken:*

> Although there is no general constitutional right to police protection, the State may not discriminate in providing such protection. A plaintiff in an equal protection action has the burden of demonstrating discriminatory intent.... Therefore, in order to survive summary judgment, a plaintiff must go beyond the pleadings and submit evidence of specific facts that demonstrate that it is the

policy or custom of the defendants to provide less police protection to victims of domestic assault than to other assault victims. A plaintiff must also provide evidence that discrimination was a motivating factor for the defendants and that he or she was injured by operation of the policy or custom.

*Hakken v. Washtenaw County,* 901 F.Supp. at 1249.

In opposing the Defendant's Motion for Summary Judgment in this case, Plaintiff presents evidence that Defendant Mullins himself acted with a discriminatory intent in regard to his treatment of domestic violence cases. Defendant Mullins testified on deposition that, in many cases he has investigated "the woman who says she's a victim is exaggerating." (*Mullins Deposition* at 87) The record reflects that Mullins is himself a convicted domestic abuser. (*Id.* at 9). The Court also notes that the record reflects that Defendant Mullins ignored the mandatory requirements of the Ohio domestic violence law in investigating the Plaintiff's charges. Mullins' failure to even attempt an arrest of Montgomery on Wednesday, February 19, 1997 after the decedent called him at his residence evidences that he treated victims of domestic violence in a manner far different from those of other types of violence.

■ Although the Court finds this evidence compelling, it falls short of the evidence required to survive the Defendants' Motion for Summary Judgment on Plaintiff's Equal Protection claim. Plaintiff fails to proffer any evidence from which a reasonable jury could infer that it was the

---

4. The facts in this case are distinguishable from those in *Siddle v. City of Cambridge,* 761 F.Supp. 503 (S.D.Ohio 1991), cited by the Plaintiff herein. In *Siddle,* the District Court held that a temporary protective order issued by a state court under Ohio law may create a property interest. The Court further held that, if the government failed to reasonably protect the interest represented by the temporary protective order, a denial of procedural due process was established. Having so held, the Court thereupon found that the failure of

local police officers to protect the plaintiff, notwithstanding the temporary protective order, was not unreasonable and did not implicate a violation of procedural due process. In this case, no claim is made that the Plaintiff has a protected property interest in a temporary protective order. Moreover, a temporary protective order refers to a specific person who is to be protected from a potential assailant. In contrast, Sheets claims a property interest, not in a specific order, but in a more general state statute.

policy or custom of the Gallia county Sheriff's Department to provide less protection to victims of domestic violence than to other victims of violence. A policy or custom must be established through official regulations or proof of sufficient circumstances revealing a custom or pattern of discriminatory conduct. *See Watson v. City of Kansas City*, 857 F.2d 690 (10th Cir.1988); *Hynson v. City of Chester*, 864 F.2d 1026 (3rd Cir.1988). The record does not disclose such a showing. The Plaintiff has not provided an official policy, nor has she shown a custom or pattern independent of this case. As the *Hakken* court observed, when the nonmovant fails to make this showing, summary judgment is appropriate. *Hakken*, 901 F.Supp. at 1251. Consequently, the Court concludes that the Defendants are entitled to summary judgment on Plaintiff's Equal Protection claim.

## B. VICARIOUS LIABILITY

The Plaintiff also asserts claims of employer liability against Defendant Sheriff Taylor and the Gallia County Sheriff's Department. It is now well-established that a local government entity may be liable under § 1983, but only to the extent that the public body caused the constitutional violation through custom, policy or practice. *Monell v. Dept. of Soc. Serv. of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As noted by the Sixth Circuit in *Hays v. Jefferson*, 668 F.2d 869 (6th Cir.1982), "a plaintiff must show that the official at least implicitly authorized, approved or knowingly acquiesced in the unconditional conduct. . . ." *Id.* at 874. Mere knowledge of such conduct or failure to supervise the offending employee does not render the public body or officeholder liable *for the acts of a subordinate employee. Id.* at 872.

The Plaintiff claims that the Sheriff of Gallia County ratified the actions of Mullins by failing to discipline him or otherwise criticize the conduct leading to the death of Tiffany Montgomery. As noted in *Hays, supra*, the failure of a supervisory official to control a subordinate official does not render the public body liable, absent a showing that the superior official either encouraged or specifically participated in the wrongful conduct at issue. Plaintiff has presented no such evidence. Consequently, the Motion for Summary Judgment filed by Sheriff Taylor and the Gallia County Sheriff's Department is GRANTED.

## C. QUALIFIED IMMUNITY

Sergeant Mullins contends that if his actions are found to constitute a violation of § 1983, that he is entitled to qualified immunity for such actions. In *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court described the defense of qualified immunity as shielding "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The Sixth Circuit has explained that, in determining whether a right is clearly established, the Court must look "first to decisions of the Supreme Court, then to the decisions of this Court, and other courts within our circuit, and finally to decisions of other circuits." *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir.1991). The question is not whether the specific conduct in question has previously been held to be unlawful. Instead, as the Supreme Court instructed in *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the question is whether, in light of preexisting law, the unlawfulness of the conduct is apparent.

The events in question in this case took place during the month of February 1997. The Court must determine whether, on that date, a reasonable official in the Defendant's position would have believed that the conduct of which the Plaintiff complained was unlawful under § 1983. The

answer to such inquiry necessitates a review of the case law as it existed prior to February 1997.

In 1989, the Supreme Court decided the case of *DeShaney, supra,* which served to limit the liability of law enforcement officers for failing to protect citizens from violence perpetrated by third parties. The Supreme Court did note, however, that if a state official acted so as to render a citizen incapable of caring for his or her basic safety, such conduct would violate the individual's substantive due process rights under the Fourteenth Amendment. While no further Supreme Court cases have defined the parameters of *DeShaney,* a number of Sixth Circuit decisions before February of 1997 have provided additional guidance. In 1994, the Sixth Circuit decided the case of *Gazette v. City of Pontiac,* 41 F.3d 1061 (6th Cir.1994), in which the Court construed *DeShaney* to impose liability where a state actor "increase[d] the vulnerability of an individual to private acts of violence 'beyond the level it would have been at absent state action.'" *Id.* at 1065, quoting *Freeman v. Ferguson,* 911 F.2d 52, 55 (8th Cir.1990).

At least three district court decisions within the jurisdiction of the Sixth Circuit also were decided before February 1997, all of which recognized that a state actor could be liable if he or she acted so as to significantly increase the risk of danger to a particularized individual from a violent third party. E.g., *Hakken v. Washtenaw Co., supra, Smith v. City of Elyria, supra, Siddle v. City of Cambridge, supra.*

Based upon the state of the law in February 1997, this Court concludes that a reasonable official in the position of Sergeant Mullins should have known that a party's right to substantive due process is violated by a public actor whose conduct significantly increases the risk of injury from a third party. As specifically noted in *DeShaney,* decided a decade prior to the incident giving rise to this lawsuit, a public official will be liable for the violent acts of a third party if the conduct of the public official was of such a degree as to restrain or prevent the individual from protecting his or her reasonable safety. This legal proposition is found in *DeShaney* and is more clearly articulated in the 1994 decision of the Sixth Circuit in *Gazette v. City of Pontiac, supra.* For this reason, the Court concludes that Sgt. Mullins does not enjoy the defense of qualified immunity as to Plaintiff's substantive due process claim.

### IV.

In light of the foregoing, the Defendants' Motion for Summary Judgment (**Doc. # 29**) is **DENIED** as to Plaintiff's claim under the Substantive Due Process Clause of the Fourteenth Amendment against Defendant Sgt. Mullins only; the Motion is **GRANTED** with respect to all other Defendants on Plaintiff's Substantive Due Process claim. Finally, the Motion for Summary Judgment is **GRANTED** with respect to the Plaintiff's claims for violation of Procedural Due Process and Equal Protection under the Fourteenth Amendment, as to all Defendants.

**IT IS SO ORDERED.**